1999 UT 46

Mary DAY, Plaintiff, Petitioner, and Cross-Respondent,

v.

STATE of Utah, by and through the UTAH DEPARTMENT OF PUBLIC SAFETY; the Utah Highway Patrol; Ken Colyar; Salem City Corporation, a municipal corporation of the State of Utah; Brad James; Spanish Fork City Corporation, a municipal corporation of the State of Utah; Ed Asay; Public Entities 1–3; and John Does 1–8, Defendants, Respondents, and Cross-Petitioners.

No. 940583.

Supreme Court of Utah.

May 11, 1999.

Larry R. Keller, Craig L. Boorman, Salt Lake City, for plaintiff.

Jan Graham, Att'y Gen., Carol Clawson, Solicitor Gen., Debra Moore, Asst. Att'y Gen., for defendants.

STEWART, Justice:

¶ 1 Mary Day brought this action against the State of Utah, the Utah Highway Patrol (UHP), a UHP officer, and several municipalities and law enforcement officers they employed for personal injuries to herself and the wrongful death of her husband. The injuries and death resulted from the collision of the Days' automobile with an automobile driven by sixteen-year-old Stephen Edward Floyd. Floyd was fleeing from UHP Officer Ken Colyar, who initiated the pursuit to cite Floyd for driving ten miles per hour over the speed limit.

¶ 2 This case is here on a writ of certiorari to the Utah Court of Appeals to review that court's affirmance of a trial court's summary judgment against plaintiff on the ground that her claims for severe personal injuries and the death of her husband were barred by a now repealed provision of the Utah Governmental Immunity Act and that that abrogation of a remedy for her injuries and her husband's death did not violate Article I, section 11, the "open courts" provision of the Utah Constitution. *See Day v. State,* 882 P.2d 1150 (Utah Ct.App.1994). The Court of Appeals' panel that decided this case suggested that this Court grant Day's petition for a writ of certiorari to answer important questions of law. The State filed a conditional cross-petition for a writ of certiorari asking this Court, if it granted Day's petition, to also grant a writ of certiorari to review the Court of Appeals' ruling that a police officer who undertakes a high-speed chase of a fleeing misdemeanant owes a duty of due care to other persons using the highway. We granted both petitions.

## I. FACTS

¶ 3 On March 18, 1991, at approximately 5:45 p.m., Officer Colyar was parked just off Interstate 15 near Santaquin, Utah, to monitor traffic. With a radar gun he clocked a northbound black 1982 Buick at 75 miles per hour, ten miles per hour over the posted speed limit. Intending only to stop the vehicle and issue a citation for speeding, Officer Colyar pulled onto I–15 and drove up behind the vehicle. Floyd, the driver of the vehicle, increased his speed and exited I–15 at Santaquin. Ignoring a stop sign, he turned onto a two-lane highway and proceeded, at times in heavy traffic and at speeds of up to 120 miles per hour, through the towns of Springville, Payson, Salem, and Spanish Fork, Utah. Officer Colyar followed in close pursuit. At least two other local law enforcement officers joined the chase through several populated areas in the towns and villages at speeds far in excess of posted limits. Floyd and Officer Colyar wove in and out between cars in heavy traffic in both the southbound and northbound lanes, passing cars on both the left and the right and forcing several cars off the road. Local police officers Brad James and Ed Asay unsuccessfully attempted to block Floyd's way and later joined in the pursuit.

¶ 4 At one point, Floyd drove onto a freeway entrance ramp with Officer Colyar close behind and collided with a semi-trailer truck. Floyd's vehicle spun almost 240 degrees around and temporarily came to a stop. Of-

ficer Colyar also stopped, but he neither drew his gun nor attempted to disable Floyd's vehicle; however, he was close enough to read the vehicle's license plate. Floyd eluded Officer Colyar and again entered the freeway with Officer Colyar in pursuit through heavy traffic and at speeds in excess of 100 miles per hour. Floyd entered an off-ramp at high speed, ran a red light while driving at approximately 60 miles per hour, and collided with the Day vehicle and three other vehicles.

¶ 5 Mr. Day died immediately, and Mrs. Day suffered numerous serious injuries. She was diagnosed with acute respiratory failure, fractures in her ankle, hip, and ribs, various abrasions, and trauma. She lay in a coma for several hours. The impact of the collision also aggravated previously existing medical conditions, including cancer and osteoporosis.

¶ 6 Mrs. Day brought this suit against the State of Utah, by and through the Utah Department of Public Safety; the UHP; Officer Colyar; and unnamed public entities and John Does for the wrongful death of her husband and for her injuries. In her first amended complaint, she also named Salem City Corporation, Officer Brad James, Spanish Fork City Corporation, and Officer Ed Asay as defendants.

¶ 7 Plaintiff and defendants filed motions for summary judgment. The trial court entered summary judgment against plaintiff and in favor of all defendants. The Court of Appeals affirmed, ruling that (1) Officer Colyar owed a tort duty of due care to plaintiff and other users of the highway, but (2) the action was barred under the Utah Governmental Immunity Act and (3) the relevant provisions of the Act were not unconstitutional under the Open Courts, Due Process, or Equal Protection provisions, i.e., Article I, sections 8, 11, and 22, of the Utah Constitution. *See Day v. State,* 882 P.2d 1150 (Utah Ct.App.1994). Only these three rulings, as they involve the State and the UHP, are now before this Court. Day does not challenge the Court of Appeals' ruling affirming summary judgment in favor of the municipalities and the law enforcement officers.

## II.  STANDARD OF REVIEW

■ ¶ 8  The issues before the Court are questions of law that we review for correctness. We accord no deference to the legal decisions of the lower court. *See Ferree v. State,* 784 P.2d 149, 151 (Utah 1989); *Bushnell Real Estate, Inc. v. Nielson,* 672 P.2d 746, 749 (Utah 1983).

## III.  DUTY OF POLICE OFFICER TO THIRD PERSONS WHILE EFFECTUATING ARREST

■ ¶ 9  We first consider the issue raised by the State's cross-petition for certiorari: Whether the Motor Vehicle Code imposes on a police officer engaged in pursuit of a suspect a duty of care to third parties on the highway. The Court of Appeals held that such a duty does exist. *See Day,* 882 P.2d at 1154. It addressed the duty issue first on the principle that a case should be decided on non-constitutional grounds if possible and that constitutional issues should be addressed only when necessary. *See World Peace Movement v. Newspaper Agency Corp.,* 879 P.2d 253, 257 (Utah 1994); *State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993). We take the same approach.

■ ¶ 10  In a personal injury case involving a defense of governmental immunity such as this case, we generally decide first whether the defendant owed a duty of due care to the plaintiff before deciding whether the defendant is entitled to the affirmative defense of governmental immunity. *See Rollins v. Petersen,* 813 P.2d 1156, 1162 & n. 3 (Utah 1991). On numerous occasions, this Court has held that certain government agencies and their employees owed no duty of care to the plaintiffs, even though such government agencies had a general duty to further and protect the public's health, safety, and welfare. In such cases, the immunity issue was not reached because the plaintiffs failed to make out prima facie cases of negligence. *See Ferree,* 784 P.2d at 152–53; *Ledfors v. Emery County Sch. Dist.,* 849 P.2d 1162, 1164 (Utah 1993). By distinguishing between an absence of duty of due care on the part of a government agency to an in-

jured person and the affirmative defense of governmental immunity, a court can more clearly define the scope of each body of law and the policies that underlie them. If Officer Colyar owed no duty of care to the Days, there can be no prima facie case of negligence as a matter of law, and immunity would be immaterial. *See Rocky Mt. Thrift Stores, Inc. v. Salt Lake City Corp.*, 887 P.2d 848, 852 (Utah 1994); *Rollins*, 813 P.2d at 1162 & n. 3; *see also Duncan v. Union Pac. R.R. Co.*, 842 P.2d 832, 836 n. 1 (Utah 1992) (Stewart, J., dissenting).

¶ 11   The State denies that it or Officer Colyar owed a duty of care to the Days. It relies on the position that the State's "public duties" cannot be the basis for a tort duty of due care that runs to specific individuals who are harmed by governmental action. The law states, "For a governmental agency and its agents to be liable for negligently caused injury suffered by a member of the public, the plaintiff must show a breach of a duty owed him as an individual, not merely the breach of an obligation owed to the general public at large by the governmental official." *Ferree*, 784 P.2d at 151. The State denies that it owes any duty of care to third persons who are injured by a collision with one fleeing arrest, irrespective of the reason for the pursuit.

■   ¶ 12   The public duty doctrine provides that although a government entity owes a general duty to all members of the public, that duty does not impose a specific duty of due care on the government with respect to individuals who may be harmed by governmental action or inaction, unless there is some specific connection between the government agency and the individuals that makes it reasonable to impose a duty. *See, e.g., DeBry v. Noble*, 889 P.2d 428, 440 n. 12 (Utah 1995); *Madsen v. Borthick*, 850 P.2d 442, 444 (Utah 1993); *South v. Maryland*, 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1855).

■   ¶ 13   At least four circumstances may give rise to a special relationship between the government and specific individuals.[1]   A special relationship can be established (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.[2]   *See, e.g., Nelson v. Salt Lake City*, 919 P.2d 568 (Utah 1996) (city's maintenance of fence along waterway); *Rollins v. Petersen*, 813 P.2d 1156 (Utah 1991) (mental hospital patient); *Ferree v. State*, 784 P.2d 149 (Utah 1989) (no duty to protect from specific threats from halfway-house inmate); *Little v. Division of Family Servs.*, 667 P.2d 49, 53–54 (Utah 1983) (state had legal custody of autistic child); *Benally v. Robinson*, 14 Utah 2d 6, 376 P.2d 388 (1962) (officer had duty of due care to drunk

---

1.   *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), stated some of the considerations that determine whether a special relationship exists: Determining whether one party has an affirmative duty to protect another ... requires a careful consideration of the consequences for the parties and society at large. If the duty is realistically incapable of performance, or if it is fundamentally at odds with the nature of the parties' relationship, we should be loath to term that relationship "special" and to impose a resulting "duty," for it is meaningless to speak of "special relationships" and "duties" in the abstract. These terms are only labels which the legal system applies to defined situations to indicate that certain rights and obligations flow from them....
   *Id.* at 418.

2.   Some courts have also recognized an exception to the public duty rule "where there is an affir-

mative act by the officer causing injury." *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380, 385 (1983); *see also Frye v. Clark County*, 97 Nev. 632, 637 P.2d 1215, 1216 (1981) (noting an exception to the public duty rule "where the official negligence affirmatively causes the individual harm"); *Warren v. District of Columbia*, 444 A.2d 1, 7–8 (D.C.Ct.App.1981) (distinguishing cases involving "negligent performance of police duties" on the ground that those cases "involve[d] acts of affirmative negligence, for which anyone—police or civilian—would be liable"); *cf. Garnett v. City of Bellevue*, 59 Wash. App. 281, 796 P.2d 782, 785 (1990) (where officers allegedly mistreated women accused of soliciting lounge patrons, court found public duty doctrine inapplicable because the "infliction of emotional distress [in the case] was the result of direct contact with the plaintiff, not the performance of a general public duty").

person taken into custody); Restatement (Second) of Torts § 314A (1965).

■ ¶ 14 The first exception applies in this case. Officer Colyar had a statutory duty to exercise reasonable care in using his patrol car to pursue Floyd. The Motor Vehicle Code in effect at the time of the accident, Utah Code Ann. § 41–6–14 (1988), imposed a duty on operators of emergency vehicles such as police cars to act with due regard for the safety of other persons on the road, as the Court of Appeals held. *See Day,* 882 P.2d at 1154. Section 41–6–14 exempted drivers of emergency vehicles from compliance with (1) speed limits, "if the operator does not endanger life or property," and (2) other traffic laws, if the operator provides audible and visual signals when in pursuit of an actual or suspected violator of the law.[3] However, section 41–6–14(3)(a), which was in effect at the time of the accident in this case, states that "[t]he privilege[ ] [of disregarding traffic laws] do[es] not relieve the operator of an authorized emergency vehicle from *the duty to operate the vehicle with regard for the safety of all persons." Id.* § 41–6–14(3)(a) (repealed effective July 1, 1993) (emphasis added). In addition, § 41–6–76 of the Motor Vehicle Code states that although all other motor vehicle operators have an obligation to yield the right-of-way to an emergency vehicle operating under the guidelines of § 41–6–14, "the operator of an authorized emergency vehicle [is not relieved] from *the duty to drive with regard for the safety of all persons using the highway. Id.* § 41–6–76(2) (1988) (emphasis added). These provisions clearly state that operators of emergency vehicles must operate their vehicles in "regard for the safety of all persons."[4] That language imposes on operators of emergency vehicles a duty of care with regard to others using the streets and highways. Utah cases decided under this provision and its antecedents have specifically imposed such a duty. *Howe v. Jackson,* 18 Utah 2d 269, 421 P.2d 159, 161–62 (1966), held that even though an ambulance driver was exempt from certain traffic regulations, "he was nevertheless not excused from using reasonable care under the circumstances, and ... any careless, arbitrary or unreasonable exercise of those privileges would be negligence." *Jensen v. Taylor,* 2 Utah 2d 196, 271 P.2d 838 (1954), held that the statute imposed on a fire truck driver a duty of due care that was not satisfied merely by using a siren or warning lights. *See also Cornwall v. Larsen,* 571 P.2d 925, 928 (Utah 1977) (Ellett, C.J., con-

---

**3.** The text of Utah Code Ann. § 41–6–14 (1988), as pertinent here, states:

(2) The operator of an authorized emergency vehicle may:
(a) park or stand, irrespective of the provisions of this chapter;
(b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
(c) exceed the maximum speed limits if the operator does not endanger life or property; or
(d) disregard regulations governing direction of movement or turning in specified directions.
(3) Privileges granted under this section to an authorized emergency vehicle apply only when the vehicle sounds an audible signal under Section 41–6–146, or uses a visual signal as defined under Section 41–6–132, which is visible from in front of the vehicle.
(a) *The privileges under this section do not relieve the operator of an authorized emergency vehicle from the duty to operate the vehicle with regard for the safety of all persons, or protect the operator from the consequences of an arbitrary exercise of the privileges.*
*Id.* (emphasis added).

**4.** The statute was first enacted in 1931. It clearly established a duty of reasonable care on the part of operators of emergency vehicles to those sharing the use of a road with emergency vehicles. The statute imposed a duty of care on the driver toward "all persons using the street." Although the statute exempted drivers of an emergency vehicle from speed limits, it did not "relieve the driver ... from the duty to drive with due regard for the safety of all persons using the street, nor shall it protect the driver of any such vehicle from the consequences of a reckless disregard of the safety of others." 1931 Utah Laws ch. 49, § 25. That statutory provision has been subsequently revised, repealed, reinstated, and repealed again in 1993. *See* 1941 Utah Laws ch. 52, § 5 (duty provision repealed); 1949 Utah Laws ch. 65, § 57–7–82(e) (duty provision reinstated); 1995 Utah Laws ch. 71, § 41–6–14(b) ("arbitrary exercise" replaced "reckless disregard for the safety of others"); 1961 Utah Laws ch. 86, § 41–6–14((b) repealed); 1965 Utah Laws ch. 83, § 41–6–14((b) reinstated); 1978 Utah Laws ch. 33 (recodified at § 41–6–14(3)(a)); 1987 Utah Laws ch. 138, § 7 (revised, "driver" changed to "operator," "due" struck from "due regard"); 1993 Utah Laws ch. 71, § 3((3)(a) repealed).

curring with explanation) ("The driver of a police car, thus *is* liable in a civil action for a failure to drive with due regard for the safety of others.").

¶ 15   The State contends that the statute does not impose a duty on the emergency vehicle driver "to control the manner in which another operates his vehicle on the road."   We agree, but neither the Court of Appeals nor plaintiff has asserted that Officer Colyar had a duty to "control" Floyd. Plaintiff contends simply that Officer Colyar breached his duty to conduct his pursuit with due regard for the safety of all persons because it should have been *reasonably foreseeable to Officer Colyar* that his high-speed chase of Floyd through populated areas, if continued, would likely cause a collision between another vehicle and either Floyd's or Officer Colyar's vehicle, resulting in injury or death to the driver or passengers of the other vehicle.   Had Officer Colyar terminated the pursuit, that risk would undoubtedly have terminated.   At least that is an inference to which plaintiff was entitled on the motion for summary judgment.

■ ¶ 16   The State correctly states that emergency vehicles in the above cases were directly involved in the accident that gave rise to the injuries for which suit was brought.   Nevertheless, the instant case does not fall outside the scope of the legal principles applied in those cases.   Whether the State might be liable in the instant case raises an issue of proximate cause as to whether it was reasonably foreseeable that Colyar's continuing the chase might result in Floyd's car colliding with another.   That is not an issue for summary judgment.   *See Harline v. Barker,* 912 P.2d 433, 439 (Utah 1996); *Mitchell v. Pearson Enters.,* 697 P.2d 240, 245 (Utah 1985).   In similar instances, we have held that such an issue is for the jury. *See Cruz v. Middlekauff Lincoln–Mercury, Inc.,* 909 P.2d 1252, 1257 (Utah 1996) (holding that car dealership that left keys in cars parked on its lot that were stolen could be liable for injuries to third person negligently caused by thief); *City of Pinellas Park v. Brown,* 604 So.2d 1222, 1228 (Fla.

1992) (police chase presented jury proximate cause issue); *Lowrimore v. Dimmitt,* 310 Or. 291, 797 P.2d 1027, 1030–31 (1990) (recognizing that proximate cause could be satisfied in police chase context); *Travis v. City of Mesquite,* 830 S.W.2d 94, 98–99 (Tex.1992) (rejecting argument that there is no proximate cause as a matter of law in police chase context).

■ ¶ 17   The issue of whether police officers owe a duty of care to third parties who are injured by fleeing suspects is an issue that a number of other states have decided. The majority of recent cases hold that an action will lie in such circumstances.   The New Jersey Supreme Court, in *Tice v. Cramer,* 133 N.J. 347, 627 A.2d 1090, 1103–04 (1993), stated: "The majority of recent cases, however, hold that a police officer or a governmental employer may be held liable for third-party injuries when the police officer is negligent in continuing a vehicular chase." *Accord Biscoe v. Arlington County,* 738 F.2d 1352, 1366 (D.C.Cir.1984) (stating "numerous jurisdictions have recognized a cause of action for negligent conduct of a high-speed chase, where the pursued vehicle strikes and injures an innocent third party").   *See also Seals v. City of Columbia,* 575 So.2d 1061 (Ala.1991); *Tetro v. Town of Stratford,* 189 Conn. 601, 458 A.2d 5 (1983); *City of Miami v. Horne,* 198 So.2d 10 (Fla.1967); *Mixon v. City of Warner Robins,* 264 Ga. 385, 444 S.E.2d 761 (1994); *Boyer v. State,* 323 Md. 558, 594 A.2d 121 (1991); *Fiser v. City of Ann Arbor,* 417 Mich. 461, 339 N.W.2d 413 (1983); *Lee v. City of Omaha,* 209 Neb. 345, 307 N.W.2d 800 (1981); *Lowrimore v. Dimmitt,* 310 Or. 291, 797 P.2d 1027 (1990); *Haynes v. Hamilton County,* 883 S.W.2d 606 (Tenn.1994); *Travis v. City of Mesquite,* 830 S.W.2d 94 (Tex.1992); *Mason v. Bitton,* 85 Wash.2d 321, 534 P.2d 1360 (1975).   A few states, however, require a showing of gross negligence before imposing liability.   *See Breck v. Cortez,* 141 Ill.App.3d 351, 95 Ill. Dec. 615, 490 N.E.2d 88 (1986); *Bullins v. Schmidt,* 322 N.C. 580, 369 S.E.2d 601 (1988); *Peak v. Ratliff,* 185 W.Va. 548, 408 S.E.2d 300 (1991).[5]

---

5.   A small minority of opinions holds that a police officer cannot be held liable for injuries to a third

person arising out of a high-speed chase.   *See United States v. Hutchins,* 268 F.2d 69 (6th Cir.

¶ 18   Several of these cases are closely on point. The Washington Supreme Court, in *Mason v. Bitton*, 85 Wash.2d 321, 534 P.2d 1360 (1975), construing an emergency vehicle statute with nearly identical provisions to Utah Code Ann. § 41–6–14, rejected the argument that the State advances in the instant case. The court concluded that the Washington Legislature, by enacting the statute, intended to protect "persons and property from *all consequences* resulting from negligent behavior of the enforcement officers," including injury to third parties caused by fleeing suspects. *Id.* at 1363.

¶ 19   The Michigan Supreme Court in *Fiser v. City of Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413 (1983), also construed a statute similar to Utah's and held that a police officer owes a duty to other drivers on the road who may be injured as a proximate result of his negligence. As in the instant case, *Fiser* involved a motorist whose vehicle was struck by a fleeing suspect. The court stated that the legislative intent behind the statute was clear: "[E]mergency vehicles must be driven with due regard for the safety of others," *id.* at 417, and the jury, in deciding whether a police officer breached this duty, should consider, among other things, the speed and location of the chase, the presence of pedestrians and other vehicles, and the reason for initiating the pursuit. *See id.*

¶ 20   Maryland's highest court has also held that the state can be held liable for injuries to third persons arising from a high-speed chase. The court held that

> police officers owe a duty of care to a plaintiff injured by suspected criminals fleeing the officers if the officer "set in motion a chain of events which they know or should have known would lead to … [the plaintiff's] injury by the [party being pursued] or by the police effort to stop the vehicle."

*Boyer v. State*, 323 Md. 558, 594 A.2d 121, 134 (1991) (quoting *Keesling v. State*, 288 Md. 579, 420 A.2d 261, 267 (1980)). The

court grounded its decision on both statutory and common law. *See id.* (citing Maryland Code § 21–106(d); *Martin v. Rossignol*, 226 Md. 363, 174 A.2d 149 (1961); *Sudbrook v. State*, 153 Md. 194, 138 A. 12 (1927)).

¶ 21   The State argues that a pursuing officer owes no duty of care to protect other persons on the highway from a negligent or reckless fleeing suspect. Specifically, the State asserts that because Officer Colyar could not directly control Floyd's actions, Floyd alone was responsible for Mrs. Day's injuries and her husband's death. However, the cases discussed above and Utah Code Ann. § 41–6–14(3)(a) support the proposition that Officer Colyar had a duty of care to other users of the highways and streets. Those cases also support the proposition that his conduct could be found to be a proximate cause of the Days' injuries if they were reasonably foreseeable. This Court has held that one may be liable for the reckless or negligent acts of another if they are reasonably foreseeable. *See Cruz v. Middlekauff Lincoln–Mercury, Inc.*, 909 P.2d 1252, 1257 (Utah 1996); *cf. United States v. First Sec. Bank*, 208 F.2d 424, 429–30 (10th Cir. 1953) (construing Utah law); *see also Stark v. City of Los Angeles*, 168 Cal.App.3d 276, 214 Cal.Rptr. 216 (1985) (police have duty to drive so as not to impose unreasonable risk of harm on others, even when pursued person collides with third party); *Tetro v. Town of Stratford*, 189 Conn. 601, 458 A.2d 5 (1983) (negligence of pursued does not foreclose liability of officers); 8 Am.Jur.2d *Automobiles and Highway Traffic* § 456 (1997); Restatement (Second) of Torts § 303 (1965). This duty is based on a reasonable person's obligation to refrain from actions that may foreseeably result in injury. *See* 2 Fowler V. Harper & Fleming James, Jr., *The Law of Torts* § 16.12, at 940 (1956).

¶ 22   According to the State, Officer Colyar owed only a generalized duty to the public at large to enforce the law; therefore, the State cannot be held liable for Floyd's conduct. The State relies on the following

1959); *Thornton v. Shore*, 233 Kan. 737, 666 P.2d 655 (1983); *Chambers v. Ideal Pure Milk Co.*, 245 S.W.2d 589 (Ky.Ct.App.1952); *Kelly v. City of Tulsa*, 791 P.2d 826 (Okla.Ct.App.1990);

*Dickens v. Horner*, 531 Pa. 127, 611 A.2d 693 (1992); *Nevill v. City of Tullahoma*, 756 S.W.2d 226 (Tenn.1988).

cases: *Rollins v. Petersen*, 813 P.2d 1156 (Utah 1991); *Ferree v. State*, 784 P.2d 149 (Utah 1989); *see also Obray v. Malmberg*, 26 Utah 2d 17, 484 P.2d 160 (1971) (sheriff held not liable for failing to investigate burglary); *Cannon v. University of Utah*, 866 P.2d 586 (Utah Ct.App.1993); *Lamarr v. Utah Dep't of Transp.*, 828 P.2d 535 (Utah Ct.App.1992).

¶ 23  These cases are clearly distinguishable.  First, none of them dealt with facts similar to those in the instant case.  Second, in none of the cases was there a statute that imposed a duty of care on the government employee with respect to others in the particular circumstances.  Third, the defendants in those cases were not, as here, acting in a continuous manner that created a direct, obvious, and imminent hazard to third persons that could have been obviated by the officer's ceasing the conduct creating the risk.  Clearly, those cases in which injuries are caused by persons who have been chased or have escaped from custody, such as in *Rollins* and *Ferree*, stand for different principles than those applicable to this case.

¶ 24  The nature of Officer Colyar's pursuit of Floyd created an immediate, obvious, and significant threat of serious harm to other users of the highway that would no doubt have ended had he terminated his pursuit.  Although law enforcement officers have a general duty to apprehend those who break the law, that duty is not absolute, especially where the violation is only a misdemeanor or an infraction—such as driving ten miles per hour over the speed limit—and the attempt to apprehend the person creates a serious risk of death or injury to third persons or the fugitive.  It has been held that, in apprehending someone, a law enforcement officer must act reasonably and may not use all available means to apprehend a fleeing suspect to arrest him for a misdemeanor.  Thus, officers may not use lethal force to stop one who has committed a misdemeanor. *See Graham v. State*, 31 Okla.Crim. 125, 237 P. 462 (1925); *Gosczinski v. Carlson*, 157 Wis. 551, 147 N.W. 1018, 1020 (1914) ("Under the rules of the common law, officers were not justified to shoot persons attempting to escape from their custody in case of arrests

for a misdemeanor....").  The threat of injury to the safety of the person fleeing and to the safety of bystanders is significant enough, and the magnitude of the possible harm so momentous, to dictate that the fleeing person be allowed to escape rather than imperiling his safety or the safety of others. *See Edgin v. Talley*, 169 Ark. 662, 276 S.W. 591, 594 (1925) (officer who fired at misdemeanant's auto, injuring passenger, could be held liable for "negligent and careless" use of firearms); *Davis v. Hellwig*, 21 N.J. 412, 122 A.2d 497 (1956) (negligence claim stated where officer fired at fleeing misdemeanant and bullet ricocheted and hit bystander); *Moore v. Foster*, 182 Miss. 15, 180 So. 73, 74 (1938) (officers who hit plaintiff when they fired above heads of fleeing misdemeanants to frighten them into stopping, acted "negligently and wrongfully"); *see also Shaw v. Lord*, 41 Okla. 347, 137 P. 885, 886–87 (1914) (peace officer's privilege to use firearm in attempt to arrest felony fugitive did not relieve officer of duty to avoid injuring bystander); *Askay v. Maloney*, 92 Or. 566, 179 P. 899, 903–04 (1919) (same).

¶ 25  The State also argues that Officer Colyar's pursuit was nonactionable because he was engaged in a discretionary function.  For reasons discussed *infra*, the law that governs is not the law at the time of statehood with respect to whether a cause of action lies against a law enforcement officer for actions taken in trying to apprehend a misdemeanant, as the State argues and the Court of Appeals ruled.  Rather, the issue is determined by the standards imposed by section 41–6–14 (1988) and the current general principles governing police conduct.  Implicit in the cases discussed above that hold officers liable for carelessly injuring others while engaged in hot pursuit is the proposition that the discretion which an officer uses in such a pursuit is not sufficient to bar such an action.

¶ 26  The general rule with respect to whether police conduct and its endangerment of others is actionable is stated in K.C. Davis & R.J. Pierce, Jr., *Administrative Law Treatise* ¶ 19.3 at 217 (3d ed.  1994): "Although much police work is highly discretionary, the courts over long period have classified police

action as ministerial; that means that a [police] officer generally has only qualified immunity, not absolute immunity, even when what he does is clearly discretionary." That proposition is implicitly and firmly established in Utah law. *See Cornwall v. Larsen,* 571 P.2d 925, 927 (Utah 1977); *Benally v. Robinson,* 14 Utah 2d 6, 376 P.2d 388 (1962); *Jackson v. Harries,* 65 Utah 282, 236 P. 234 (1925); *Geros v. Harries,* 65 Utah 227, 236 P. 220 (1925); *see also Payne v. Myers,* 743 P.2d 186 (Utah 1987); *Frank v. State,* 613 P.2d 517 (Utah 1980).

¶ 27  Indeed, older cases say little or nothing about the official immunity of police officers, but they clearly support holding police officers liable for their negligent acts, particularly when attempting arrests. *See, e.g.,* Restatement (Second) of Torts § 895D (1979); Annotations, *Personal Liability of Peace Officer or His Bond for Negligence Causing Personal Injury or Death,* 18 A.L.R. 197 (1922), 39 A.L.R. 1306 (1925); Annotation, *Personal Liability of Policeman, Sheriff, or Other Peace Officer, or Bond, for Negligently Causing Personal Injury or Death,* 60 A.L.R.2d 873 (1958); 80 C.J.S. *Sheriffs and Constables* § 52 (1953); 70 Am. Jur.2d *Sheriffs, Police, and Constables* § 90 (1987).

¶ 28  Officers have also been liable for negligently injuring bystanders while trying to apprehend a fleeing misdemeanant. *E.g., Edgin v. Talley,* 169 Ark. 662, 276 S.W. 591 (1925) (officer shot at car driven by misdemeanant with intent to force car to stop, but hit passenger; court observed that officer has no right to use firearms in such a negligent manner); *Davis v. Hellwig,* 21 N.J. 412, 122 A.2d 497 (1956) (where officer shot at misdemeanant and bullet ricocheted and hit bystander, court found that bystander stated negligence claim); *Young v. Kelley,* 60 Ohio App. 382, 21 N.E.2d 602 (1938) (officer could be held liable for injury to woman on street where he fired at drunk who had escaped custody, trying to frighten drunk into stopping). This duty of care toward bystanders in attempting an arrest has also been imposed where the degree of force used was

lawful. *See Shaw v. Lord,* 41 Okla. 347, 137 P. 885, 886–87 (1914) (officer's privilege to shoot at felony fugitive in attempting arrest did not relieve him of "duty to exercise such care to avoid injury to other persons as a person of ordinary prudence would usually exercise in doing so under like circumstances," so bystander hit by bullet stated jury negligence issue); *Askay v. Maloney,* 92 Or. 566, 179 P. 899, 903–04 (1919) (although officers were within their authority in firing on fleeing robbery suspects, innocent bystanders were nevertheless owed duty of care, and thus bystander injured by stray bullet could state negligence claim).

¶ 29  The Court of Appeals relied on *Garff v. Smith,* 31 Utah 102, 86 P. 772 (1906), for the "conclusion that a cause of action would not lie at common law against Trooper Colyar." *Day,* 882 P.2d at 1158. *Garff* held that an *administrative* officer was not liable in performing a quasi-judicial function pursuant to statute. *See* 86 P. at 774. Trooper Colyar's actions here were not quasi-judicial; they were not directed by statute; and although they involved some discretion in performing an operational task, they were not discretionary as our cases define that word for purposes of governmental immunity. *Frank v. State,* 613 P.2d 517 (Utah 1980), held that the discretionary function exception "should be confined to those decisions and acts occurring at the 'basic policy-making level,' and not extended to those acts and decisions taking place at the operational level ... 'which concern routine, everyday matters, not requiring evaluation of broad policy factors.'" *Id.* at 520 (quoting *Carroll v. State Road Comm'n,* 27 Utah 2d 384, 388, 496 P.2d 888, 891 (1972)).

¶ 30  After initially clocking Floyd at ten miles per hour above the speed limit, Officer Colyar commenced pursuit and also inquired over the radio whether Floyd's vehicle was stolen. The dispatcher reported that there was no indication it was stolen, yet Officer Colyar continued the pursuit at speeds on and off the freeway in urban areas up to 120 miles per hour.[6]  The fact finder on remand

---

6.  It was later learned that the vehicle was stolen, but that is irrelevant to Officer Colyar's reasons

for the high-speed chase. We are concerned

will have to determine whether it was or should have been reasonably foreseeable to Officer Colyar that the high-speed pursuit through highly populated areas would endanger the lives of others on the road and whether, if he had terminated the pursuit, Floyd would likely have substantially reduced his speed and terminated his otherwise reckless driving. Officer Colyar had a statutory duty to use care for the safety of other persons on the road. *See* Utah Code Ann. § 41–6–14. Whether he failed to comply with the statute and breached his duty is a question for the jury.

¶ 31  In conclusion, while police officers and drivers of other emergency vehicles are not bound by all traffic laws and do not necessarily violate a duty of due care when they exceed the speed limit or do not comply with certain other safety regulations, a police officer in pursuing another on a public highway or street nevertheless does owe a duty of reasonable care under the circumstances to other motorists on the road. We certainly do not suggest that police officers are never justified in engaging in high-speed pursuits. The need to apprehend a person who is a danger to others because of the serious and violent nature of the crime for which he or she is sought or because his or her presence on the highway presents a threat to public safety may well outweigh the risks that a high-speed pursuit poses to innocent third parties.[7] *See City of Pinellas Park v. Brown,* 604 So.2d 1222, 1227 (Fla.1992) (police required "to use reasonable means in light of the nature of the offense and threats to safety involved"); *see also Mixon v. City of Warner Robins,* 264 Ga. 385, 444 S.E.2d 761, 763–64 (1994) (holding that decision to initiate or continue pursuit may be negligent

when heightened risk of injury to third parties is unreasonable in relation to need to apprehend suspects); *Travis v. City of Mesquite,* 830 S.W.2d 94, 99 (Tex.1992) (same).

¶ 32  The test is whether the driver of the emergency vehicle acted reasonably and with appropriate care for the safety of others in light of all the circumstances. Among the factors that should be considered in deciding whether an officer acts with reasonable care for the safety of others using the highways and streets are the density of traffic and population of the area in which the pursuit occurs; whether the area is rural or urban; the nature of the street, e.g., whether freeway or city streets with stop signs and semaphores; the presence of pedestrians and school zones; the weather and visibility; and, of course, the urgency of apprehending the fleeing person and whether allowing that person to escape may itself pose a serious threat to the safety of others. *See Peak v. Ratliff,* 185 W.Va. 548, 408 S.E.2d 300, 308 (1991).

IV. SOVEREIGN IMMUNITY, OFFICIAL IMMUNITY, AND THE OPEN COURTS CLAUSE OF THE UTAH CONSTITUTION

¶ 33  The statutory provision that the Court of Appeals held barred Day's action against the State was in effect for only one year and six days. Section 63–30–7 of the Governmental Immunity Act, as it read just prior to the amendment that gave rise to this case, waived immunity under certain conditions if the operator of an emergency vehicle exceeded the speed limit and thereby endangered life or property or did not operate his

only with what Officer Colyar knew or reasonably should have known at the time.

7. Recognizing these conflicting considerations and concluding that high-speed chases are not justified at all in certain circumstances, the Salt Lake City Police Department has adopted guidelines barring high-speed chases in all cases but those involving the commission of a violent felony, when the suspect "poses an imminent danger if not apprehended immediately." Salt Lake City Police Dep't, *Police Manual* § 4–08–20.03 (rev. June 1995). Even more explicitly, under the most current regulations, a police officer

must terminate his pursuit "[w]hen the risks of the pursuit are not warranted because the danger it is causing the community is greater than the need for immediate apprehension of the suspect." *Id.* at § 4–08–20.08. Police departments and courts in other jurisdictions have required a similar balancing. *See City of Pinellas Park v. Brown,* 604 So.2d 1222, 1224 (Fla.1992) (police policy); *Lee v. City of Omaha,* 209 Neb. 345, 307 N.W.2d 800, 803 (1981) (same); *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992); *Mason v. Bitton,* 85 Wash.2d 321, 534 P.2d 1360, 1363 (1975) (same).

vehicle "with regard for the safety of all persons" or arbitrarily exercised the privileges granted. Section 63–30–7 (1989) stated:

> Immunity from suit of all governmental agencies is waived for injury resulting from the negligent operation by any employee of a motor vehicle or other equipment during the performance of his duties, within the scope of employment, or under color of authority; *provided, however, that this section shall not apply to the operation of emergency vehicles as defined by law and while being driven in accordance with the requirements of Section 41–6–14.*

(Emphasis added.) Section 41–6–14 (1988) of the Motor Vehicle Code, referred to in section 63–30–7 above, exempted the operator of an authorized emergency vehicle from speed limits, *"if the operator does not endanger life or property,"* id. § 41–6–14(2)(c) (emphasis added), and from certain other traffic regulations. Subsection 3(a) of section 41–6–14 stated: *"The privileges under this section do not relieve the operator of an authorized emergency vehicle from the duty to operate the vehicle with regard for the safety of all persons, or protect the operator from the consequences of an arbitrary exercise of the privileges."* (Emphasis added.)

¶ 34 Effective April 23, 1990, the Legislature amended section 63–30–7 by adding subsection (2)(a) to provide a limited immunity for a very narrow type of emergency vehicle operation. However, the amendment maintained the general waiver of immunity if an emergency vehicle was not operated in compliance with section 41–6–14. The amended section read as follows:

> (1)(a) Immunity from suit of all governmental entities is waived for injury resulting from the negligent operation by any employee of a motor vehicle or other equipment during the performance of his duties, within the scope of employment, or under color of authority.

> (b) This subsection does not apply to the operation of emergency vehicles as defined by law and while being driven in accordance with the requirements of Section 41–6–14.

> (2)(a) All governmental entities employing peace officers retain and do not waive immunity from liability for civil damages for personal injury or death or for damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he is being or has been pursued by a peace officer employed by the governmental entity in a motor vehicle.

Utah Code Ann. § 63–10–7 (Supp.1990). Subsection (2)(a) was in effect for six days more than a year. It was repealed effective April 29, 1991, six weeks after the collision between Floyd and the Days, when the Legislature repealed all of section 63–30–7, *see* 1991 Utah Laws ch. 76, § 10, and in lieu thereof added subsection 15 to section 63–30–10, the general waiver of governmental immunity for injury caused by an act or omission of a government employee, with a list of exceptions to the waiver. *See id.* ch. 76, § 4. Subsection 15 of § 63–30–10 barred an action for the negligent "operation of an emergency vehicle *while being driven in accordance with the requirements of Section 41–6–14."* Utah Code Ann. § 63–30–10(15) (Supp.1991) (emphasis added). Thus, the Legislature abolished the narrow immunity created by subsection (2)(a) and reestablished the law as it had existed from the time the Governmental Immunity Act was first established.

¶ 35 The Court of Appeals ruled that subsection (2)(a) of section 63–30–7 was constitutional and barred Mrs. Day's claims. *See Day v. State*, 882 P.2d 1150, 1159 (Utah Ct.App.1994). The consequence of that ruling, together with the immunity conferred on government *employees* in 1983 by enactment of section 63–30–4(3)(a) and (b) of the Governmental Immunity Act for negligent and reckless acts,[8] was to leave Mrs. Day with no

---

**8.** Utah Code Ann. § 63–30–4(3) (Supp.1991) states:

(a) Except as provided in Subsection (b), an action under this chapter against a governmental entity or its employee for an injury caused by an act or omission that occurs during the performance of the employee's duties, within the scope of employment, or under color of authority is a plaintiff's exclusive remedy.

remedy at all against the State or its employees. The rationale for the Court of Appeals' opinion that section 63–30–7(2)(a) was constitutional was that the "common law doctrine of governmental immunity as it had developed to the time of Utah's statehood[ ] precluded a cause of action" in favor of one injured by a high-speed police pursuit of a fleeing suspect. *Day*, 882 P.2d at 1159. In our view, the Court of Appeals erred in two respects. First, the rights protected by Article I, section 11 are not defined by those causes of action that existed in 1896. Second, the law, both in Utah and in other states, has long recognized the principle that negligence of law enforcement officers in apprehending a fleeing misdemeanant may be actionable by one injured as a result of the negligence. We have established that point above.

¶ 36 The proposition that Article I, section 11 should be construed to protect only those rights and remedies that were recognized under the common law at the time of statehood is not supported by *Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985), or by its progeny with one exception, or by the case law preceding *Berry*. Indeed, the proposition that section 11 protects only those rights and remedies that existed at the time of statehood conflicts with the tenor and underlying purpose of Article I, section 11. To hold that Article I, section 11 rights are defined by the state of the law at the time of statehood would be to ossify the law pertaining to remedies designed to protect the constitutionally protected values of "person, property [and] reputation." In addition, it would improperly interfere with legislative prerogatives necessary to make the law responsive to the exigencies of changing conditions. The plain language of section 11 provides no basis for concluding that those

rights are time-bound. Article I, section 11 states in pertinent part:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay. . . .

¶ 37 The proposition that the rights protected by this provision are defined by the law as it existed in 1896 has been rejected in a number of opinions of this Court, both expressly and implicitly, in part because it has no textual basis, would tend to freeze the law at a particular point in time and thereby subvert the normal and necessary evolution of the law as times change, and would otherwise improperly interfere with legislative prerogatives. *Berry* made explicit that a person's right to a remedy for an injury to person, property, or reputation by due course of law is not determined by whether the common law recognized the particular cause of action in 1896: [9]

[N]either the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies as of the time of statehood. It is, in fact, one of the important functions of the Legislature to change and modify the law that governs relations between individuals as society evolves and conditions require.

*Id.* at 676 (citation and footnote omitted). In *Cruz v. Wright*, 765 P.2d 869 (Utah 1988), Justice Zimmerman wrote for the Court:

Nowhere in this state's jurisprudence is it suggested that article I, section 11 flatly prohibits the legislature from altering or even abolishing certain rights which existed at common law. *See Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676, 680 (Utah 1985). . . . In fact, in

---

(b) A plaintiff may not bring or pursue any other civil action or proceeding based upon the same subject matter against the employee or the estate of the employee whose act or omission gave rise to the claim, unless:
  (i) the employee acted or failed to act through fraud or malice; or
  (ii) the injury or damage resulted from the conditions set forth in Subsection 63–30–36(3)(c).

9. The proposition that *Berry* in effect constitutionalized the common law was explored at some length in the separate concurring opinions of Justices Stewart and Zimmerman in *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194, 1213–16 (1999) (Stewart, J., concurring); *id.* at 1228–35 (Zimmerman, J., concurring). Justice Russon and Justice Durham concurred in the concurring opinion of Justice Stewart. *See id.* at 1198 n. 5, 1223.

*Berry*, we specifically stated that the legislature may eliminate or abrogate a cause of action entirely if there is sufficient reason and the elimination or abrogation "is not an arbitrary or unreasonable means [of] achieving the objective." 717 P.2d at 680.

*Id.* at 871. This Court has sounded the same theme in numerous other opinions. *See De-Bry v. Noble*, 889 P.2d 428, 435–36 (Utah 1995); *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1090 (Utah 1989); *Sun Valley Water Beds v. Herm Hughes & Son, Inc.*, 782 P.2d 188, 191 (Utah 1989); *see also* Paxton R. Guymon, Note, *Utah Prison Physicians: Can They Commit Malpractice With Impunity or Does Their Official Immunity Violate the Open Courts Clause?*, 1997 Utah L.Rev. 873, 882, 897–900.[10] More recently, Justice Howe, writing for a unanimous court in *Hirpa v. IHC Hospitals*, 948 P.2d 785, 792 (Utah 1997), sustained the constitutionality of the Utah Good Samaritan Act against an Article I, section 11 challenge:

This provision, as we have interpreted it, imposes a substantive limitation on the legislature's ability to eliminate or unduly restrict causes of action seeking relief for injury to "person, property, or reputation." *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985).

Despite the importance of this function, the rights of individuals protected by the open courts provision must be balanced against the legislature's need to enact laws to meet changing societal needs. Thus, the rights protected by the open courts provision are "not always paramount," *id.* at 677, and "the Legislature has great latitude in defining, changing, and modernizing the law, and in doing so may create new rules of law and abrogate old ones." *Id.* at 676. This is so because "[i]t is, in fact, one of the important functions of the Legislature to change and modify the law that governs relations between individuals as society evolves and conditions require." *Id.* Thus, we will declare a statute violative of the open courts provision only if it "is unreasonable and arbitrary and will not further the statutory objectives." *Id.* at 681.

¶ 38 The determination of whether a person who is injured in "person, property, or reputation" has been denied a remedy by due course of law should be decided by reference to the general law of rights and remedies at the time that the Legislature abrogates a remedy. Then Chief Justice Hall, writing for a unanimous Court in *Sun Valley Water Beds*, 782 P.2d at 191, addressed that precise issue in stating that the Legislature "does not have unbridled power to deny to contemporary plaintiffs their *existing common law rights and remedies*." (Emphasis added.) In *Masich v. United States Smelting, Refining & Mining Co.*, 113 Utah 101,

---

10. Concededly, *Ross v. Schackel*, 920 P.2d 1159 (Utah 1996), sounded a discordant note with respect to the above principles. *See generally* Guymon, *supra* ¶ 37. In *Ross*, the Court stated that whether section 63–30–4(4), the provision in the Governmental Immunity Act that barred suits against government employees for negligence, was unconstitutional as applied to a prison physician for malpractice on a prisoner turned on whether the provision abrogated a remedy that existed under the common law at the time of statehood. *Id.* at 1162. For that proposition, the Court cited *Berry*, 717 P.2d at 676 n. 3. The footnote in *Berry* which *Ross* relied on stated in pertinent part that to "some extent, ... the common law at the time of statehood provides at least a measure of the kinds of legal rights that the framers must have had in mind for the protection of life, property, and reputation." *Id.* This language refers to the kinds of "legal rights" that tended to define the legal nature of person, property, and reputation that were entitled to a "remedy by due course of law." That footnote can certainly not be construed to override the basic thesis reiterated several times in the text of the *Berry* opinion that Article I, section 11 did not constitutionalize the common law or freeze the law at any given point in time. *See id.* at 676, 677; Guymon, *supra* ¶ 37, at 882. Moreover, *Ross* was decided to some extent on the basis of the policy considerations of allowing an action to proceed against a prison physician by inmates, a position consistent with that part of *Berry* that allows the abrogation of a remedy by the necessity of vindicating a "social or an economic evil." *Ross*, 920 P.2d at 1162 (citing *Berry*, 717 P.2d at 677 n. 4, 680). It may be that the notion that Article I, section 11 protected only those remedies recognized in 1896 came from statements in our opinions that the Framers of the Constitution, in adopting Article I, section 11, undoubtedly intended that the general principles on which the common law was founded were not ipso facto displaced by section 11. *See DeBry v. Noble*, 889 P.2d 428 (Utah 1995).

191 P.2d 612 (1948), the plaintiff asserted the Legislature had unconstitutionally abrogated his common law action for damages that existed at the time of the lawsuit by enacting the exclusive remedy provision of the Occupational Disease Act. The Court sustained the constitutionality of the abrogation of a plaintiff's common law course of action, but the decision was not concerned at all with the causes of action the plaintiff had as of 1896. *See id.* at 624–25. The Court was concerned only with whether the remedies provided under the Act were reasonable alternatives to the common law remedies that the Act displaced.

¶ 39  The remedies unconstitutionally abrogated by the statute of repose in *Berry* were remedies based on the existing body of rights and remedies then available generally to persons injured in their person, property or reputation. The Court in *Berry* focused only on the abrogation of those legal remedies that were generally available at the time of the lawsuit for the protection of person and property. *See* 717 P.2d at 681–83. That was also the focus of the Court's analysis in *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194 (1999), *Horton v. Goldminer's Daughter*, 785 P.2d 1087 (Utah 1989), and *Sun Valley Water Beds v. Herm Hughes & Son*, 782 P.2d 188 (Utah 1989). Indeed, some of the remedies abrogated in *Craftsman, Horton, Sun Valley,* and *Berry* did not even exist in 1896. *See Horton*, 785 P.2d at 1088–90. *Accord, e.g., Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 861 P.2d 625, 629 (1993); *Boswell v. Phoenix Newspapers*, 152 Ariz. 9, 730 P.2d 186, 194–95 (1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987); *Kluger v. White*, 281 So.2d 1, 4 (Fla.1973); *Perkins v. Northeastern Log Homes*, 808 S.W.2d 809, 816 (Ky.1991); *Nat'l Ref. Co. v. Seehorn*, 344 Mo. 547, 127 S.W.2d 418, 424 (1939). The general precept was stated more recently in *DeBry v. Noble*, 889 P.2d 428 (Utah 1995):

> The fundamental interests of "life, liberty, and property," as protected by the due process clause and of "person, property and reputation" as protected by article I, section 11 were to be protected as societal and jurisprudential concepts of those terms evolved. For the law to freeze the

meaning of those clauses as of one point in time would be to deny the essential meaning and purpose that was built into those clauses by the broad, expansive language that the Constitution uses.

889 P.2d at 435.

¶ 40  The Legislature does, of course, have the power to abrogate such remedies. However, that power is not absolute. Under the test stated in *Berry*, an abrogation of remedies must meet the following standards:

> First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . .
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Berry*, 717 P.2d at 680.

¶ 41  Thus, if the Legislature abrogates a remedy, and if it provides an "effective and reasonable alternative remedy," *id.*, the abrogation meets the requirements of Article I, section 11. *See Payne v. Myers*, 743 P.2d 186, 190 (Utah 1987) (suit against the State for negligence in lieu of suit against state employee). In a number of instances, the Legislature has provided non-common law alternative remedies in lieu of common law remedies that it abrogated, such as in the No–Fault Insurance Act, the Worker's Compensation Act, and the Occupational Disease Act. *See Masich v. United States Smelting, Refining & Mining Co.*, 113 Utah 101, 191 P.2d 612, 624–25 (1948).

¶ 42  We examine now the first part of the *Berry* test. In 1983, the Legislature amended section 63–30–4(3) and abrogated all rem-

edies against the tortfeasors themselves for negligence and recklessness of government employees acting in the course and scope of their employment. 1983 Utah Laws ch. 129, § 3. Government employees are now personally liable only for fraud or malice. *See id.* The consequence of that amendment was to abrogate the remedies that one who had been injured by the negligence or recklessness of a government employee had against the government employee personally. However, in lieu of that remedy, one injured by the negligence or recklessness of a government employee was provided a remedy against the government agency.

¶ 43 Thus, Mrs. Day was barred by section 63–30–4 from asserting an action against Officer Colyar. However, the amendment to section 63–30–7 in 1990 also barred her action against the government agency. Thus, for a period of a year and six days, the State barred all actions of the type asserted by Mrs. Day against both the government agency and its employees.[11]

¶ 44 Under this circumstance, we must turn to the second part of the *Berry* test. If the Legislature provides no alternative remedy, the abrogation is valid if it is justified by a "clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Berry,* 717 P.2d at 680. In this case, we can look to the legislative history of the bill that amended § 63–30–7 to bar the action against the government agency to determine the reason for its enactment and whether the abrogation was "an arbitrary or unreasonable means for achieving" the elimination of a "clear social or economic evil." *Berry,* 717 P.2d at 680.

¶ 45 Senator Richard Carling, the sponsor of Senate Bill 194, explained the reason for the bill on the Senate floor:

Mr. President, this is a bill that came to us from the law enforcement community. They are being bothered by frivolous law-

suits now, by individuals not particularly in Utah, but this is a rash that started especially in California. . . . But because of the rash of suits mainly to try to get the government entity to come up with some money and settle these types of cases, suits have been filed. We want to put in statute what we understand to be the common law rule that if a police vehicle is chasing a suspect, and that suspect is involved in an accident, that there will not be liability to the police department or to the local government unless there was a reckless disregard of the safety of the public and therefore they would be able to come back against the police agency for that reason. . . . We understand that is the common law, and it [is] merely to try to stop some frivolous lawsuits that are being filed harassing government and police entities.

See Senate debate, Senator Richard J. Carling, S.B. 194, February 4, 1990.

¶ 46 On its face, this statement identifies no social, economic, or any other "evil" in Utah. The problem identified by the sponsor of the amendment was a "rash" of "frivolous lawsuits" in California. No evidence was presented showing that Utah had experienced a similar rash of such frivolous lawsuits. Indeed, the sponsor made clear that the basis for the amendment was the situation in California, but "not particularly in Utah." In other words, the Legislature was not acting to obviate a "clear social evil" in Utah. *See Lee v. Gaufin,* 867 P.2d 572, 583–88 (Utah 1993) (holding unconstitutional legislative abrogation of remedies based on economic and social problems that had occurred in other states but not in Utah).

¶ 47 Nor was there any showing that such an evil was likely to occur in Utah. Indeed, the fact that there was truly no factual basis for the abrogation of plaintiff's remedy is convincingly shown by the Legislature's repeal of the Act a little more than one

---

11. It is of no legal consequence under our Article I, section 11 analysis that plaintiff might have had a claim against Floyd. Indeed, the State does not argue otherwise. In *Sun Valley Water Beds v. Herm Hughes & Son,* 782 P.2d 188, 192 (Utah 1989), this Court held that alternative claims against other possible defendants do not constitute "substitute or alternative remedies" for section 11 purposes. The Court stated that "alternative claims are to be distinguished from substitute or alternative remedies." *Id.*

year after its enactment and six weeks after the accident in issue.

¶ 48 Finally, Senator Carling's statement in support of the amendment misstated the actual effect of the amendment. Senator Carling stated that the amendment was intended to enact "the common law rule" that where a police vehicle chases a suspect and that suspect is involved in an accident, there is no liability unless the officer was engaged in "reckless disregard of the safety of the public." That clearly was not the effect of the amendment. In fact, it imposed an absolute bar to such an action, whether based on recklessness or some other standard. In truth, the stated factual and legal bases justifying the amendment were simply in error, as is evident from its quick repeal. The stated basis for the abrogation of the remedy had no foundation. It follows that the Act barring the action for the time it was in effect was unconstitutional.

¶ 49 Reversed and remanded to the district court for trial.

¶ 50 Associate Chief Justice DURHAM and Justice RUSSON concur in Justice STEWART'S opinion.

¶ 51 Chief Justice HOWE concurs in the result.

ZIMMERMAN, Justice, dissenting:

¶ 52 I dissent from the conclusion that section 63–30–4 is unconstitutional because it violates article I, section 11 of the Utah Constitution. I would affirm the grant of judgment to the defendants.

¶ 53 Today's majority opinion marks yet another twist in the *Berry v. Beech Aircraft* saga. While our cases applying the *Berry* analysis in the area of governmental immunity have heretofore looked to the state of the law at the time of statehood as a reference point for determining the tort rights that the legislature may not reduce without meeting *Berry*'s high standards, *see Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.,* 974 P.2d 1194, 1224, 1228–31 (1999) (Zimmerman, J., concurring in the result), today Justice Stewart explicitly abandons that reference point. *See supra* ¶¶ 36–40. This may be because of the absurdities that this standard has introduced into the law, as highlighted by the court of appeals analysis in this case. *See Craftsman,* 974 P.2d at 1228–31 (Zimmerman, J., concurring in the result). But in any event, Justice Stewart now says that under *Berry,* the sole referent against which any legislative attempt to limit tort liability will be measured is the "general law of rights and remedies at the time that the Legislature abrogates a remedy." *See supra* ¶ 38. The majority, then, no longer even purports to refer to any fixed historical point or fact to set the measure of the rights that article I, section 11 protects. It reads the Utah Constitution to effectively enshrine safe from legislative diminishment our tort case law and any pertinent legislative enactments on any day that the legislature tries to act.

¶ 54 It cannot be doubted that the *Berry* analysis puts this court in the role of second guessing the wisdom of the legislature by a standard that can seldom be met. The majority opinion, like other of our *Berry* precedents, closely reviews the whys and wherefores of the legislation under attack and finds them wanting. Here, as in *Berry* and *Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.,* 782 P.2d 188, 193 (Utah 1989), for example, the majority finds that the legislature was naive and poorly informed, and concludes that "the stated factual and legal bases justifying the amendment were simply in error." *See supra* ¶ 48. The evil that the legislature thought it was addressing just doesn't exist, according to this court. Therefore, the statute is unconstitutional. Whatever I may think of the profundity of the legislature's justifications for section 63–30–4—justifications it found unpersuasive only a year later when it repealed the statute—I reject this court's claim of entitlement to constitutionally second guess the legislature in this fashion under the guise of article I, section 11. I continue to view this ad hoc constitutionalization of the existing law to put it beyond the legitimate reach of the legislature as an unjustifiable judicial arrogation of power, one certainly never intended by the drafters of the constitution and never anticipated by this court before *Berry. See Craftsman,* 974 P.2d at 1230–36 (Zimmerman, J., concurring in the result).

¶ 55 My views on this matter, and on *Berry v. Beech Aircraft* where this claim originated, are fully set forth in my concurrence in *Craftsman,* and will not be repeated here. But I will persist in asserting the illegitimacy of the course we are embarked on under *Berry.*